# Supreme Court of Florida

_____

No. SC12-555
_____

**BILL PAUL MARQUARDT**,
Appellant,

vs.

**STATE OF FLORIDA**,
Appellee.

[January 22, 2015]

PER CURIAM.

Bill Paul Marquardt appeals his convictions and death sentences for the March 2000 first-degree murders of Margarita Ruiz and Esperanza "Hope" Wells. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons that follow, we affirm Marquardt's convictions and death sentences.

We also reaffirm our commitment to the principles and procedures articulated in Muhammad v. State, 782 So. 2d 343 (Fla. 2001), that require a trial court to consider mitigation evidence even when the defendant waives mitigation. However, recognizing the tension that may exist when a trial court appoints standby counsel to present mitigation evidence in these circumstances, as was done

in this case, we prospectively modify the Muhammad procedures to the limited extent that trial courts should utilize an independent, special counsel—rather than standby counsel—to represent the public interest in bringing forth all available mitigation for the benefit of the jury, the trial court, and this Court.

## FACTS AND PROCEDURAL HISTORY

### Florida Murders

On March 15, 2000, Ruiz and her adult daughter, Wells, were at their house in Sumter County, Florida. That morning, Ruiz's daughter-in-law brought her one-year-old son and three-year-old daughter to the house. When Ruiz's daughter-in-law departed, she exited through a screen door at the back of the house, which Wells then latched.

Later that day, two Sumter County deputies went to the house in response to a 911 call from Wells's husband, who asked the sheriff's department to attempt to make contact with anyone in the house. When the deputies arrived, they discovered that the screen door at the back of the house was open. The deputies proceeded through the house and discovered the bodies of Ruiz and Wells inside a bedroom. The children, who were hiding under the dining room table, were the only survivors.

Subsequently, the sheriff's department requested that the Florida Department of Law Enforcement (FDLE) respond to the house to process the crime scene. The

FDLE crime scene technician noted that the latch to the screen door at the back of the house had been broken. He also discovered fired cartridge cases on the back porch area of the house, as well as blood and a bullet hole in the freezer door. A bullet was embedded inside the freezer. The FDLE technician concluded that at least one bullet was fired into the house from outside and that the bullet found in the freezer struck a person before it lodged in the freezer.

The medical examiner reconstructed the manner in which Ruiz and Wells were killed based on their injuries and the evidence found at the house. Ruiz was shot twice while in the kitchen. The bullet that was found in the freezer had first penetrated her chest. She was shot a second time while she stood in front of the back screen door. The bullet grazed her thumb and then punctured her chest, which indicated that her arm was raised in front of her chest at the time she was shot. Ruiz then fled the kitchen, ran through the dining room and living room, and was shot a third time in the back as she fled into a bedroom. The bullet passed through her spinal cord, causing her to collapse. She was then stabbed in the neck. She died from multiple gunshot wounds, with a contributory factor of sharp force injuries to the neck.

Wells, found in the bedroom next to her mother's body, had been shot once in the head from a distance of less than eighteen inches. The injury would have caused her to feel faint and collapse in seconds, quickly rendering her unconscious

and causing her death.  After Wells was shot, she was stabbed in the neck eight times.

An officer who had responded to the scene took the children outside and asked the three-year-old girl if she knew who had committed the crime.  She stated that she did not know but responded, in part, that the killer left in a green car.

The FDLE collected DNA and latent palm print evidence from the house.  A DNA swab taken from the living room revealed a mixed DNA profile that contained DNA from at least three individuals.  Two of the three profiles matched Ruiz and Wells.  The DNA of the third individual could not be identified at the time.  Additionally, a latent palm print was retrieved from a countertop in the kitchen, which also could not be identified.

The investigation into the murders then became dormant until June 2006, when the Sumter County Sheriff's Office received information regarding a separate murder investigation in the state of Wisconsin.  Wisconsin law enforcement had investigated the murder of Mary Marquardt, who was killed on March 13, 2000, two days before Ruiz and Wells were murdered, and the investigation eventually led to Bill Paul Marquardt being charged with the murder of his mother, Mary.  Other than the evidence obtained from Wisconsin law enforcement during their investigation, the murder of Mary Marquardt apparently is unrelated to the murders of Ruiz and Wells.

During their investigation, Wisconsin law enforcement performed DNA testing on items obtained from Marquardt. The testing revealed DNA from two individuals who they could not identify, but determined to be related females who were most likely mother and daughter. When Marquardt was acquitted of the murder of Mary, a Wisconsin attorney involved in the case sought to identify the women whose DNA was discovered on the items obtained from Marquardt. His research revealed the unsolved murders of Ruiz and Wells, and he contacted Sumter County law enforcement. The previously unidentified DNA from the items obtained from Marquardt in Wisconsin matched that of Ruiz and Wells.

Marquardt was subsequently indicted for the first-degree murders of Ruiz and Wells and for burglary of a dwelling with a firearm. At the time, Marquardt was incarcerated in a Wisconsin mental health facility pursuant to a guilty verdict for animal cruelty charges in Wisconsin.

**Wisconsin Investigation**

The majority of the evidence that connects Marquardt to the murders of Ruiz and Wells was obtained in a series of searches by Wisconsin law enforcement officials in the unrelated murder investigation of Mary Marquardt. On March 15, 2000, the same day as the Florida murders, Wisconsin law enforcement obtained a warrant to search Marquardt's cabin, located in Eau Claire County, Wisconsin. During the search, officers found dead animals, which led them to obtain a warrant

for Marquardt's arrest for animal cruelty.  On March 18, 2000, Marquardt was arrested at his cabin.  He was searched incident to his arrest, and a folding knife was retrieved from his pocket.  Officers subsequently collected the clothing he was wearing at the time of the arrest, which included black jeans, a black shirt, a denim jacket, and tennis shoes.

The clothing and the knife were tested for DNA.  A mixed DNA profile from three individuals was found on the jacket.  Marquardt was determined to be a possible contributor, along with two unidentified females, who were labeled as unidentified individuals one and two.  The likelihood of the mixed profile on the jacket coming from individuals other than Marquardt and unidentified individuals one and two was determined to be one in eighty sextillion.  A mixed DNA profile from at least three individuals was also found on the pocket knife, again with Marquardt as a possible contributor, along with unidentified individuals one and two.  The likelihood of the mixed profile on the knife coming from individuals other than Marquardt and unidentified individuals one and two was determined also to be one in eighty sextillion.  A shoe recovered from Marquardt was found to have DNA from a single-source profile that matched unidentified individual one.  Further DNA testing revealed that the two unidentified individuals were related females, most likely mother and daughter.

The Wisconsin investigation revealed that Marquardt traveled from Valdosta, Georgia, to Long Key, Florida, in his green Ford Thunderbird between March 14 and March 15, 2000, the latter date being the date of the Ruiz and Wells murders. Marquardt maintained a storage unit in Valdosta in which he stored his green Ford Thunderbird. The storage facility required a person to input a unit-specific gate code to enter and exit the property. The code assigned to Marquardt was used on March 14, 2000, to enter and exit the facility.[1] When the storage unit was later searched, a red Mercury Tracer was in the unit rather than a green Ford Thunderbird. Therefore, it appears that on March 14, 2000, Marquardt entered the storage unit and removed his green Thunderbird, leaving the red Tracer. When the Thunderbird was searched after Marquardt's arrest, law enforcement discovered a map of Florida and a receipt for Fiesta Key Resort KOA in Long Key, Florida. The receipt reflected a check-in date of March 15, 2000 (the day Ruiz and Wells

_____

1. The storage unit records reflect that Marquardt's code was used on March 15, 1999. However, the manager testified that the computer system did not register the year 2000, and instead reflected 1999. Because 2000 was a leap year, and 1999 was not a leap year, unless the computer system had been recalibrated after February 29, 2000, to reflect the correct date, March 15, 1999, on the computer system was actually March 14, 2000. Although the storage facility manager could not recall during trial whether he had recalibrated the system, a Wisconsin detective testified that he spoke with the manager on March 31, 2000, and at that time, the manager stated that the date on the system was wrong due to the leap year.

were murdered), and a check-out date of March 16, 2000. The receipt reflected the name Dan Marquardt, but listed the license plate number for Marquardt's vehicle.

Law enforcement found a blood stain on the armrest of the Thunderbird. The blood was tested for DNA and was determined to have a mixed DNA profile with a major and a minor contributor. The major contributor was determined to be an unknown female, and the likelihood that Marquardt was the minor contributor was one in four.

Marquardt's Wisconsin cabin was searched after his arrest for animal cruelty on March 18, 2000, and again on March 29, 2000. During the March 29 search, two boxes of ammunition were discovered under the refrigerator, as well as a Stallard 9 mm model JS semiautomatic gun and 9 mm bullets.[2]

### Evidence Connecting Marquardt to Florida Murders

In 2006, six years after the murders, a Wisconsin attorney contacted Sumter County law enforcement regarding the murders of Ruiz and Wells. The DNA of the two unidentified females found on the clothing and knife seized from

_____

2. Marquardt claimed that the handgun and bullets found under the refrigerator were planted there by the killer after his arrest and that he was framed. He emphasized that this evidence was not discovered by law enforcement during the March 18 search, or by his father who went to the cabin after the March 18 search to secure the windows. However, Wisconsin law enforcement explained that the evidence could not be seen on March 18 because there was a pile of clothing in front of the refrigerator and, additionally, it was difficult to see in the cabin on March 18 because law enforcement had shot tear gas into the cabin.

Marquardt was compared to that of Ruiz and Wells. The DNA from unidentified individual one matched the DNA from Wells, and the DNA from unidentified individual two matched the DNA from Ruiz. Thus, Ruiz and Wells were the two unidentified females whose DNA was in the mixed DNA profiles on the jacket and knife recovered from Marquardt in Wisconsin. Additionally, the blood from Marquardt's shoe and the Thunderbird was determined to be from Wells.

Further, a FDLE DNA analyst compared Marquardt's DNA to DNA found in the victims' home. Marquardt's DNA matched the DNA extract found in the living room. The likelihood that the DNA came from any male other than Marquardt was one in three billion. Additionally, a FDLE firearms analyst examined the handgun that was found at Marquardt's cabin. The analyst determined that the casings and bullets found at the victims' residence were fired from the handgun recovered from Marquardt's cabin.

### Defense Case

Before trial, the Office of the Public Defender was appointed to represent Marquardt. However, the Public Defender certified a conflict and was allowed to withdraw. An attorney with the Office of Regional Criminal Conflict and Civil Regional Counsel (CCCRC) was then appointed, but subsequently withdrew. Although an attorney certified for capital cases was appointed on July 20, 2010, Marquardt determined that he would prefer to represent himself. On September

30, 2010, after a <u>Faretta</u>[3] inquiry, the trial court allowed Marquardt to proceed pro se. The previously appointed counsel was appointed as standby counsel.

In his case in defense, Marquardt emphasized that no fingerprints were found on the firearm or ammunition boxes, and there were no usable fingerprints on the knife. He also presented evidence that the display carton for the knife had a latent print that was not from Marquardt. Further, he presented witnesses who testified to driving past the victims' house on the morning of the murders. The witnesses testified that they had seen a green vehicle, but none of the witnesses described the vehicle as a green Thunderbird. He also presented evidence that the FDLE located a latent print in the victims' home that could not be identified, and that green fibers located next to the victims also could not be identified but did not match any fibers recovered from Marquardt's vehicle.

### Verdict and Penalty Phase

On October 12, 2011, the jury convicted Marquardt of the first-degree murders of Ruiz and Wells and of burglary of a dwelling with a firearm. Marquardt waived a penalty-phase jury recommendation and elected to represent himself during the penalty phase. Pursuant to the requirements delineated by this Court in <u>Muhammad v. State</u>, 782 So. 2d 343 (Fla. 2001), the trial court appointed the investigators that Marquardt had retained during the guilt-phase trial to

---

3. <u>Faretta v. California</u>, 422 U.S. 806 (1975).

investigate mitigation evidence for the penalty phase.  The trial court also relieved standby counsel from his duties as standby counsel and appointed him to present mitigation evidence for the court.  Finally, the trial court appointed the doctor who had conducted a competency evaluation for Marquardt to evaluate Marquardt for possible mental health mitigation.

On February 1, 2012, the trial court held a combined Faretta and Spencer[4] hearing.  The State presented victim impact statements from Pam Ruiz, the daughter-in-law of Ruiz and sister-in-law of Wells, and Robert Wells, the son-in-law of Ruiz and husband of Wells.  The State also presented the testimony of the medical examiner.  The medical examiner testified that Ruiz was shot twice in her chest while in the kitchen, and that with immediate medical attention those injuries would not have been fatal.  The injuries would have caused her to cough up blood almost immediately, would have decreased her respiratory capacity, and would have caused her lung to collapse within several minutes.  The medical examiner stated that he could not speculate as to how this would affect her mental ability, but that "generally speaking, she's shot, she probably realized she was and ran, like anybody else would."  With respect to Wells's murder, the medical examiner testified that she was shot in her face from a range of less than two feet.  This injury would have caused Wells to lose consciousness before Ruiz.

_____

4.  Spencer v. State, 615 So. 2d 688 (Fla. 1993).

Marquardt chose not to present mitigation evidence during the Spencer hearing. Although he maintained his innocence, he stated that it was in his best interest to receive the death penalty. To that end, he asserted that several aggravating circumstances were present, including that the murders were especially heinous, atrocious, or cruel (HAC); that they were cold, calculated, and premeditated (CCP); and that he had a prior felony conviction.

The attorney appointed to assist the trial court presented mitigation. He first presented the testimony of a Wisconsin investigator, who had spoken with Marquardt's family and the principal of his high school. The investigator testified that Marquardt was a social and happy child. He was the youngest of three children and grew up in a close-knit family that went on vacations together every year and spent holidays together. Marquardt completed high school and was an average student. During school, Marquardt enjoyed music and received several musical awards within his school district. He also received several offers for college scholarships for his musical abilities, which he declined. After high school, Marquardt worked at a restaurant.

The attorney raised two statutory mitigating circumstances: (1) that Marquardt's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired; and (2) Marquardt's age at the time of the crime. As to the mental incapacity mitigator,

before extradition to Florida, Marquardt was committed to a mental health facility in Wisconsin following a guilty verdict in a Wisconsin criminal case. After the verdict, Marquardt was found incompetent to assist in his defense, and the judge entered a verdict of not guilty by reason of insanity due to mental disease or defect. In his Florida proceedings, Marquardt would not sign releases for the doctor or the investigator, and therefore no further information was available. With respect to the statutory mitigating circumstance of young age, the attorney contended that the trial court should consider this circumstance because Marquardt was twenty-four years old at the time he committed the murders.

The attorney raised as nonstatutory mitigating circumstances Marquardt's musical talent and close family ties, as well as that he did not have trouble with the law until he was nineteen years of age, had multiple employments, was not a management risk at the jail, and had no prior prison disciplinary record.

On February 28, 2012, the trial court sentenced Marquardt to death for the murders of Margarita Ruiz and Esperanza Wells, and sentenced Marquardt to life in prison for burglary of a dwelling with a firearm. In pronouncing Marquardt's sentence, the trial court found that the State had proven beyond a reasonable doubt the existence of four statutory aggravating circumstances: (1) HAC (assigned great weight); (2) CCP (assigned great weight); (3) the capital felonies were committed while Marquardt was engaged in the commission of a burglary (assigned great

weight); and (4) Marquardt had previously been convicted of another felony involving the use or threat of violence, based on a conviction for aggravated burglary in Wisconsin (assigned some weight). See §§ 921.141(5)(b), (d), (h), (i), Fla. Stat. (2011).

The trial court found two statutory mitigating circumstances. First, the trial court found that Marquardt's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired, based on his commitment to a mental health facility for separate criminal charges in Wisconsin (assigned some weight). See § 921.141(6)(f), Fla. Stat. (2011). Second, the trial court found other factors in Marquardt's background that would mitigate against imposition of the death penalty, based on Marquardt being a law abiding citizen who was close to his family before there were reported instances of criminal activity (assigned minimal weight), and the fact that he was never previously violent toward anyone (assigned minimal weight). See § 921.141(6)(h), Fla. Stat. (2011). The trial court found two nonstatutory mitigating circumstances: (1) Marquardt's good behavior during the proceedings (assigned minimal weight); and (2) Marquardt's good behavior while in jail (assigned minimal weight).

The trial court concluded that the aggravating circumstances outweighed the mitigating circumstances and imposed sentences of death for the murders of Ruiz and Wells. This appeal followed.

## ANALYSIS

On direct appeal to this Court, Marquardt raises five issues: (1) the trial court erred by applying the doctrine of collateral estoppel and denying Marquardt's motion to suppress evidence without holding an evidentiary hearing; (2) the trial court placed unreasonable restrictions on Marquardt's presentation of his case; (3) the prosecutor improperly commented on his guilt in front of the jury; (4) the trial court erred in finding the aggravating circumstances of CCP and HAC; and (5) the trial court violated the attorney-client privilege by appointing Marquardt's standby counsel and investigators to present mitigation. In addition to the claims raised by Marquardt, we must consider whether there is sufficient evidence to support Marquardt's convictions and whether the death sentences are proportionate.

### I. Motion to Suppress

A significant amount of the physical and DNA evidence introduced during trial was collected in Wisconsin as a result of the March 15, 2000, search warrant, which was applied for and executed by Wisconsin law enforcement in connection with the murder of Mary Marquardt. Evidence obtained during the March 15 search led to the issuance of a warrant for Marquardt's arrest in Wisconsin, which

- 15 -

was executed on March 18. Marquardt moved to suppress the evidence of the March 15 search and a subsequent search that occurred on March 18 during two separate criminal trials that occurred in Wisconsin.

The Wisconsin Supreme Court consolidated the appeals of the two criminal trials and ruled on the validity of the search warrant. See State v. Marquardt, 705 N.W.2d 878, 881 (Wis. 2005). The Wisconsin court concluded that although there was insufficient probable cause for the March 15 search warrant, the good faith exception established by the United States Supreme Court in United States v. Leon, 468 U.S. 897 (1984), applied, and the evidence was therefore admissible. Marquardt, 705 N.W.2d at 893. During pretrial proceedings in this case, Marquardt sought to suppress the same evidence that was challenged in the Wisconsin case, as well as evidence obtained during the March 29 search, the warrant for which was supported by evidence obtained during the March 15 search.

Before his Florida trial, Marquardt filed multiple motions to suppress the evidence obtained during the Wisconsin searches of his cabin, vehicle, and person. Marquardt also filed several motions to set a hearing on his motions to suppress. The trial court ruled that the initial motion to suppress was legally insufficient and dismissed several others as either moot or successive and redundant. However, the trial court addressed one motion to suppress on the merits, and denied it under the doctrine of collateral estoppel. The trial court stated that

collateral estoppel prevents this Court from relitigating a motion to suppress the evidence obtained from the search warrant issued on March 15, 2000 and obtained from the search of Defendant's automobile. Brown v. State, 397 So. 2d 320 (Fla. 2d DCA 1981); Miller v. State, 545 So. 2d 343 (Fla. 2d DCA 1989). The Wisconsin Supreme Court upheld the submission of the exact same evidence obtained from Defendant's residence and automobile that Defendant seeks to have excluded in this motion to suppress. See State v. Marquardt, 705 N.W.2d 878 (Wis. 2005).

Marquardt filed a motion to reconsider, in which he claimed that collateral estoppel did not apply because the issues presented in his motion to suppress were not identical to those in the Wisconsin case and had not been previously raised. He asserted that the magistrate who issued the warrant had been misled and therefore requested a Franks[5] hearing. He also contended that his Wisconsin counsel were ineffective and that the Wisconsin Supreme Court incorrectly found inferences in the affidavit that were not supported. The trial court denied the motion for reconsideration on the basis of collateral estoppel and for the additional reason that pursuant to Echols v. State, 484 So. 2d 568 (Fla. 1985), evidence that was validly obtained in another state is admissible in Florida even if it was obtained through a warrant that would be invalid in Florida.

Marquardt next filed a "Motion to Suppress on New Information and Motion to Reconsider," in which he again asserted that the Wisconsin magistrate was misled. The trial court denied this motion because it raised matters already

_____

5. Franks v. Delaware, 438 U.S. 154 (1978).

- 17 -

considered by the court.  Marquardt then filed another motion to suppress on the basis of newly discovered evidence.  Marquardt relied on a statement made during a Florida deposition by the affiant of the Wisconsin search warrant, in which the affiant stated that the affidavit did not give rise to the inferences found by the Wisconsin Supreme Court.  The trial court denied the motion as meritless.  During a hearing on pretrial motions, the trial court stated that the evidence was not newly discovered, but was based on an affidavit presumably seen by the Wisconsin Supreme Court.  The trial court did not hold an evidentiary hearing on any of the motions to suppress filed by Marquardt.

## A.  Wisconsin Decision

Because the Florida trial court relied on the Wisconsin Supreme Court's decision in denying the motion to suppress, we provide a brief background on Wisconsin search and seizure law and on the ruling issued by the Wisconsin Supreme Court in Marquardt's Wisconsin case.

The Wisconsin Constitution mirrors the language of the Fourth Amendment to the United States Constitution.  See Wis. Const. art. I, § 11.  Wisconsin

> generally [has] interpreted Article I, Section 11 to provide the same
> constitutional guarantees as the Supreme Court has accorded through
> its interpretation of the Fourth Amendment. . . .  On only one occasion
> in [Wisconsin's] development of Article I, Section 11 jurisprudence
> [has Wisconsin] required a showing different from that required by
> the Supreme Court's Fourth Amendment jurisprudence.  [Wisconsin]
> did so in regard to [its] development of a good faith exception under
> Article I, Section 11.  State v. Eason, 2001 WI 98, 245 Wis. 2d 206,

629 N.W.2d 625 (creating two additional requirements under Article I, Section 11 for law enforcement before according a good faith exception to their reliance on a defective no-knock search warrant).

Wisconsin v. Ferguson, 767 N.W.2d 187, 194 n.6 (Wis. 2009). The Florida constitutional provision on searches and seizures is construed in conformity with the Fourth Amendment to the United States Constitution, as interpreted by the United States Supreme Court. See art. I, § 12, Fla. Const. Therefore, Wisconsin generally provides the same constitutional guarantees for searches and seizures as Florida.

However, Wisconsin provides two additional protections in the application of the good faith exception articulated by the United States Supreme Court in Leon. The two additional protections are that the State must show that the process used to obtain the search warrant included: (1) a significant investigation, and (2) a review by a police officer either trained in, or very knowledgeable of, the legal vagaries of probable cause and reasonable suspicion, or a knowledgeable government attorney. State v. Eason, 629 N.W.2d 625 (Wis. 2001).

The Wisconsin Supreme Court concluded that the March 15, 2000, search warrant for Marquardt's cabin lacked sufficient facts to supply probable cause for the search. Marquardt, 705 N.W.2d at 884. Thus, the Wisconsin Supreme Court then considered whether the good faith exception to the exclusionary rule articulated in Leon and Eason applied. Id. In Leon, the United States Supreme

Court held that should officers reasonably rely upon a warrant issued by a detached and neutral magistrate, and that warrant is later determined to be invalid, evidence seized will not necessarily be suppressed. Id. at 885 (citing Leon, 468 U.S. at 913). The Wisconsin Supreme Court recognized that Leon delineates certain circumstances under which the good faith exception does not apply. Id. One circumstance that prevents the application of the good faith exception is where the warrant is so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable. Id. (citing Leon, 468 U.S. at 923). Specifically, under Leon, the exception to the exclusionary rule will not apply where an officer who has been reasonably well trained would have known, despite authorization by a neutral and detached magistrate, that a search warrant was invalid. Id. at 886-87 (citing Leon, 468 U.S. at 922 n.23).

The affidavit for the warrant application to search Marquardt's cabin on March 15, 2000, contained the following information:

> Investigator Price [of the Chippewa County Sheriff's office] reports that after finding the body of Mary J. Marquardt, he spoke with her husband, Alfred E. Marquardt. Mr. Marquardt informed him that he and Mary have a son, Bill Marquardt, who, since the location of Ms. Marquardt's body had not been seen or heard from. Alfred Marquardt further informed Investigator Price that Bill Marquardt owned with Alfred Marquardt a cabin in which Bill resided at E27505 County Highway M, Town of Fairchild, County of Eau Claire, Wisconsin.
> Investigator Price further reports that in examining the body of Mary J. Marquardt and the scene where she was found, it appeared as though among the wounds incurred by her was a knife wound. Also

at the scene, officers were able to locate a number of footprints that may be suitable for comparison with the shoes that made them.

Investigator Barnier reports that in checking Eau Claire County tax rolls, he learned that a cabin . . . located at E27505 [County] Highway M, Town of Fairchild, Eau Claire County, [is] owned by Alfred and Bill Marquardt.

Id. at 887 (alterations in original). The March 15 warrant application also incorporated an affidavit that supported the March 13, 2000, search warrant of the home of Alfred and Mary Marquardt, which stated:

Inv. Price reports that on March 13, 2000, Chippewa County Sheriff's Dispatch received a 911 call from 11766 State Hwy 178, Chippewa Falls, Township of Eagle Point. The caller identified himself as Alfred E. Marquardt, DOB 07/30/1946. Marquardt reported that his wife was apparently dead at the residence.

Price continued that he responded to the Marquardt home and met with [Alfred] Marquardt. [Alfred] Marquardt relayed that he had left home at about 7 AM that morning and tried to call home about 11:50. The phone was busy and remained so the remainder of the day. [Alfred] Marquardt stated that he left work early and returned home because of the busy phone and upon arrival, found his wife, Mary J. Marquardt covered with a blanket in the garage. She was cold and unresponsive and appeared to have a head wound.

Price reports that a shell casing, tentatively identified as 9 mm, was observed on the premises.

Id. (alterations in original).

The Wisconsin Supreme Court determined that although there was insufficient probable cause for the warrant, the warrant was nonetheless supported by sufficient indicia of probable cause to lead the officers to believe that the warrant was valid, and therefore the Leon exception applied. Id. at 888. The Wisconsin court stated that

[a] number of facts in the warrant application, along with reasonable inferences that law enforcement officers could draw from those facts, satisfy us that there is sufficient indicia of probable cause that the objects sought are linked with the commission of a crime, and that the objects sought will be found in the place to be searched.

Id. The Wisconsin court determined that four inferences could be drawn from the warrant application: (1) because the application indicated Alfred Marquardt had not seen or heard from Bill Marquardt since the location of the body two days earlier, an officer could reasonably infer that Marquardt's absence was suspicious; (2) because the body was covered in a blanket, an officer could reasonably infer that the killer was familiar with the victim; (3) because there was no indication in the application of forced entry, sexual trauma, or missing valuables, an officer could reasonably infer that the motive was not burglary or sexual assault; and (4) because the phone had been off the hook all day, an officer could reasonably infer that the killer had been inside the residence and was therefore someone the victim knew. Id. Thus, the Wisconsin Supreme Court concluded that the good faith exception applied and the evidence obtained during the March 15 and March 18 searches was admissible. Id.[6]

## B. Admission of the Evidence

---

6. The Wisconsin Supreme Court also found that the additional requirements for application of the good faith exception in Wisconsin set forth in Eason had been met. Marquardt, 705 N.W.2d at 889.

The ruling by a trial court on a motion to suppress is clothed with the presumption of correctness. Murray v. State, 692 So. 2d 157, 159 (Fla. 1997). A reviewing court must interpret the evidence and reasonable inferences and deductions in the manner most favorable to sustaining the ruling of the trial court. Id. "Appellate courts should accord a presumption of correctness to the trial court's rulings on motions to suppress with regard to the trial court's determination of historical facts, but appellate courts must independently review mixed questions of law and fact that ultimately determine constitutional issues." Schoenwetter v. State, 931 So. 2d 857, 866 (Fla. 2006) (quoting Connor v. State, 803 So. 2d 598, 608 (Fla. 2001)).

Marquardt alleged in his motion to suppress that the inference that there was no forced entry could not be drawn based on the affidavit attached to the application for the March 15 search warrant. Marquardt also alleged that the magistrate who issued the warrant was misled because Alfred Marquardt said that he had not seen Bill Marquardt since February 17, not that he had not seen him since the discovery of the body. According to Marquardt, the good faith exception to the exclusionary rule did not apply. In essence, Marquardt challenged the conclusion of the Wisconsin Supreme Court on the applicability of the good faith exception.

Evidence obtained in another state in conformity with the law of that state and the federal constitution is admissible in a Florida court.  See Echols, 484 So. 2d at 571.  In Echols, evidence against the defendant was obtained in Indiana.  Id. The defendant alleged that the evidence was obtained in violation of Florida law, and thus should be excluded.  Id.  This Court declined to apply the exclusionary rule and stated that the interests of Florida would not be served by the exclusion of relevant evidence that had been obtained lawfully in another state in conformity with the law of that state and the United States Constitution.  Id.  This Court explained that the primary purpose of the exclusionary rule is to deter police misconduct, and that exclusion of the evidence in Florida would not have any discernible effect on police officers in other states.  Id.  Therefore, the primary purpose of the exclusionary rule would not be served by exclusion of the evidence.

The March 15, 2000, search was conducted in Wisconsin by Wisconsin state law enforcement.[7]  The Wisconsin Supreme Court determined that the evidence Marquardt seeks to suppress was obtained in conformity with the good faith exception articulated by the United States Supreme Court in Leon, and also in

_____

7. Wisconsin law enforcement again searched Marquardt's cabin on March 18 and March 29, and searched Marquardt's vehicle on March 18.  Marquardt alleges that the evidence obtained during these searches should also be suppressed because they were supported by evidence obtained during the March 15 search. Thus, the validity of these later searches is controlled by the determination with respect to the March 15 search.

conformity with the additional protections mandated by its decision in Eason. Marquardt, 705 N.W.2d at 888.[8] Thus, we hold that pursuant to Echols, the evidence obtained by Wisconsin law enforcement was properly admitted. The interests of Florida in the resolution of two cold murders would not be served by the exclusion of relevant evidence that was lawfully obtained in Wisconsin because application of the exclusionary rule in this case would not have any discernible effect on deterring police misconduct, since Wisconsin law enforcement personnel are not subject to Florida law.

## C. **Franks** Claim

Marquardt next contends that the trial court should have held a Franks hearing because the Wisconsin magistrate who issued the warrant was misled by information in the affidavit that the affiant knew was false. Under Franks, a court must grant a request for a hearing if the defendant makes a substantial preliminary

---

8. We also note that Marquardt filed a petition for writ of habeas corpus in the United States District Court for the Western District of Wisconsin. Marquardt v. Dir., Mendota Mental Health Inst., 06-C-684-S, 2007 WL 528345, at *1 (W.D. Wis. Feb. 14, 2007). The federal district court determined that Marquardt was afforded a full and fair opportunity to litigate his Fourth Amendment claims in Wisconsin. Id. at *2 ("In this case the record indicates that the Wisconsin Supreme Court carefully addressed petitioner's Fourth Amendment claim concerning the search of his cabin finding that the good faith exception applied according to United States v. Leon, 468 U.S. 897, 923 (1984), because the State had shown that the process by which it obtained the search warrant included a significant investigation. Petitioner had a full and fair opportunity to litigate his Fourth Amendment claims in state court. Accordingly, petitioner's petition for a writ of habeas corpus must be dismissed. . . .").

- 25 -

showing that: (1) the affiant made a false statement either knowingly and intentionally, or with reckless disregard for the truth; and (2) the false statement was necessary to the determination that probable cause existed. 438 U.S. at 155-56. Under Leon, the good faith exception cannot be applied if the affidavit that supports the search warrant included knowing or reckless falsehoods. 468 U.S. at 914 (citing Franks, 438 U.S. at 155-56). Marquardt asserts that this issue was not litigated in Wisconsin, and, therefore, the ruling of the Florida trial court that collateral estoppel applied was erroneous.

Marquardt requested a Franks hearing for the warrant in a Wisconsin trial court. Marquardt, 705 N.W.2d at 885 n.8. During the review by the Wisconsin Supreme Court, however, he did not request a remand for a Franks hearing, and the Wisconsin Supreme Court held that Marquardt had conceded the issue, stating as follows:

> Marquardt has not argued on appeal that the other three Leon disqualifying circumstances present a bar to the application of the good faith exception in this case. We take this as a concession that those disqualifying circumstances do not apply here.
> We note, however, that with respect to the Chippewa County case, Marquardt requested a hearing under Franks v. Delaware, 438 U.S. 154 (1978), on the issue of whether the warrant application contained material misstatements and omissions. See State v. Marquardt, 635 N.W.2d 188. This issue corresponds to the first Leon disqualifying circumstance. See United States v. Leon, 468 U.S. 897, 923 (1984) (citing Franks). The court of appeals did not reach the Franks issue, see Marquardt, 635 N.W.2d 188, and it appears that Marquardt has abandoned his argument on the applicability of the first Leon circumstance. Although he made minimal reference to Franks

- 26 -

and the first <u>Leon</u> circumstance in one of his briefs and at oral argument, he has not expressly argued that this court should decide whether the first <u>Leon</u> circumstance applies and he has not requested that this court remand for a <u>Franks</u> hearing.

<u>Id.</u> Marquardt now seeks a <u>Franks</u> hearing in Florida on the same warrant to suppress the same evidence he sought to suppress in Wisconsin.

Whether the magistrate was misled is part of the good faith analysis under <u>Leon</u>. The Wisconsin Supreme Court engaged in a good faith analysis consistent with <u>Leon</u>, determined that Marquardt had conceded the <u>Franks</u> issue, and held that the good faith exception applied. <u>Id.</u> Thus, Marquardt abandoned this claim in Wisconsin, where he had an opportunity to litigate it, and the Wisconsin Supreme Court held that the evidence obtained as a result of the warrant was admissible under Wisconsin law and the United States Constitution. <u>Id.</u> at 890. As a result, the evidence was admissible in Florida pursuant to <u>Echols</u>.[9]

### D. "Tipsy Coachman" Doctrine

The trial court denied Marquardt's motion to suppress based on collateral estoppel and relied on <u>Echols</u> only as a secondary basis for the denial of the motion

---

9. Additionally, a Wisconsin Court of Appeals considered the good faith issue in an unpublished opinion that affirmed the denial of a postconviction motion filed by Marquardt. <u>State v. Marquardt</u>, 776 N.W.2d 288, 2009 WL 3273234, at *3-5 (Wis. App. Oct. 14, 2009) (unpublished opinion). The Wisconsin Court of Appeals determined that the statements in the warrant affidavit were accurate and concluded that the record did not support the allegation that the affiant intended to mislead the magistrate. <u>Id.</u> at *4. The Wisconsin appellate court concluded that no <u>Franks</u> violation occurred. <u>Id.</u>

for reconsideration. Marquardt alleges that collateral estoppel does not apply. We agree, although we nevertheless conclude that he is not entitled to relief on this claim.

Collateral estoppel applies when identical parties or their privies have previously litigated the same issue. State v. McBride, 848 So. 2d 287, 290-91 (Fla. 2003) (citing Gentile v. Bauder, 718 So. 2d 781, 783 (Fla. 1998)). Collateral estoppel requires that: (1) the identical issue was presented in a prior proceeding; (2) the issue was a critical and necessary part of the prior determination; (3) there was a full and fair opportunity to litigate the issue; (4) the parties to the prior action were identical to the parties of the current proceeding; and (5) the issue was actually litigated. Cook v. State, 921 So. 2d 631, 634 (Fla. 2d DCA 2005). The parties in this case are the State of Florida and Marquardt. However, the parties in the Wisconsin case were the State of Wisconsin and Marquardt. Thus, identity of the parties is lacking, and collateral estoppel does not apply.

Under the "tipsy coachman" doctrine, however, a trial court ruling that is based on improper reasoning will be upheld if there is any basis in the record to support the ruling. See State v. Hankerson, 65 So. 3d 502, 505 (Fla. 2011) (citing Dade Cnty. Sch. Bd. v. Radio Station WQBA, 731 So. 2d 638, 644 (Fla. 1999)). Thus, if the trial court reached the correct result based on the wrong reason, the ruling may be affirmed. Here, the record supports the conclusion that the evidence

was admissible pursuant to <u>Echols</u>, an additional basis asserted by the trial court for its denial of the motion for reconsideration. Thus, the trial court correctly denied the motion to suppress, and we affirm this ruling.

## II. Actions of the Trial Court

Marquardt next alleges that the trial court placed unreasonable restrictions on him that entitle him to a new trial. When the State approached the close of its case-in-chief, the trial court requested that Marquardt provide a list of witnesses that he expected to present during his defense. The trial court stated:

> COURT: Okay. Jurors have left the courtroom. And as they leave the courthouse, they'll be going in that direction? Okay. Mr. Marquardt, are you in a position to kind of give us an idea of what these witnesses that are coming up, at least for, let's say, Friday morning?
>
> MARQUARDT: Um, um, you want to know the list of the witnesses?
>
> COURT: Well, let's go ahead and let's get a list of your witnesses again, and just if you could—and go slowly so I can write them down so I have notes here to go through.

Marquardt then began to list the witnesses that he expected to present. When he finished, the trial court stated, "Okay. And Mr. Magrino [the prosecutor], are you aware of basically what these witnesses are about, since these are the Florida witnesses that may be available for Friday morning[?]" The prosecutor responded that he was unaware of the legal relevance of some of the witnesses listed by Marquardt. As a result, the trial court then asked Marquardt who the other

witnesses were and what testimony they would offer. Ultimately, the trial court stated: "Okay. Then subject, of course, to [the prosecutor] getting to talk to these people, I realize that'll make things move slower but soon enough, right and correct." The trial court did not request that the State prosecutor list which witnesses he intended to present or what testimony they would offer.

Marquardt admits that no objection was raised at the time the trial court made the above-mentioned request, but contends that the inquiry created a threatening atmosphere for Marquardt and resulted in fundamental error. Marquardt asserts that the trial court placed additional requirements on him, and that this exacerbated the handicaps he already experienced while representing himself—a right which exists under Faretta and the Sixth Amendment.

Because the issue was not preserved for appellate review by contemporaneous objection, it is reviewed for fundamental error. F.B. v. State, 852 So. 2d 226, 229 (Fla. 2003). An error is fundamental only if it reaches down into the validity of the trial itself to such an extent that a guilty verdict could not have been obtained in the absence of the alleged error. Brooks v. State, 762 So. 2d 879, 899 (Fla. 2000).

Every litigant is entitled to a neutral and impartial judge. State ex rel. Davis v. Parks, 194 So. 613, 614 (Fla. 1939). A judge may not step away from the appearance of neutrality and advocate for either party or interject himself or herself

- 30 -

into the proceedings.  See Williams v. State, 967 So. 2d 735, 750-51 (Fla. 2007).

To determine whether the Faretta rights of a defendant have been respected, a court

must focus primarily on whether the defendant had a fair opportunity to present his

or her case in his or her own way.  McKaskle v. Wiggins, 465 U.S. 168, 177

(1984).  Although a defendant ordinarily will lack the skill to conduct the trial as

neatly and competently as an attorney, this does not circumscribe the right of self-

representation.  Bowen v. State, 677 So. 2d 863, 866 (Fla. 2d DCA 1996), app'd,

698 So. 2d 248 (Fla. 1997).  At the same time, the authority and power of the trial

court to control the courtroom is not to be diminished by the defendant's exercise

of his constitutional right of self-representation.  Id.

The record reflects that the trial court sought to maintain an orderly

courtroom and ensure that Marquardt presented only witnesses with legally

relevant testimony.  The trial court originally asked Marquardt what witnesses he

planned to present during the first day of his defense and asked about their

testimony only when the State raised concerns about their relevancy or the

admissibility of their testimony.  The prosecutor expressed concern that Marquardt

intended to present the witnesses in an effort to reinvestigate the case before the

jury.  Indeed, in one exchange, Marquardt admitted that he did not know what one

of his witnesses would say:

> COURT:  Do you really believe that [the proposed witness] is gonna
> come in here and say he's the murderer?

MARQUARDT: Oh, no, I'm just going to question him and see if he was at the murder at the time of the murder and general questions.

COURT: Right. Well, that would make [the proposed witness] under Florida law one of the murderers. You believe that he's going to come in and say that or are you going on a fishing expedition?

MARQUARDT: No. Well, I was just going to question him and general questions like that pretty much. I don't know what he's going to say on the stand, Your Honor.

COURT: Well, then he's not going to come in here unless you have talked to him and find out what he's going to say. That's your job not mine, so.

This exchange demonstrates the trial court was concerned that Marquardt sought to conduct discovery on the witness stand. Shortly thereafter, in response to an explanation by Marquardt of the testimony of another witness, the trial court stated:

> But I guess what I'm trying to let you know but I can—there's two things I'm trying to avoid. One, and this is not picking on you in any way. I do not want a case of this serious nature to be turned into a circus, and that's quite frankly what could happen. I'm stepping past what I should as a neutral person to be telling you things that in a way are protecting you from making certain mistakes, but I've mentioned them.
>      And 98.9 percent of what you've told me is not going to be admissible from this individual. And you need to understand that this person comes in here and testifies, I'm going to hold you to that standard, and if you—as I might have to do to a lawyer, if you step out of that, this is not meant to threaten you, then there may have to be some statement in front of the jury as to what you're doing. That's not going to create a great appellate issue. And quite frankly, I have a lot of defense attorneys come in and think they can do something bizarre in court and get some reaction from the judge that creates their

great, great appellate issue. And this was something that was upsetting me. It's taught in seminars in this state, and it's wrong. It's horribly wrong and it's part of the problem with the attorneys in this state. They don't understand that is horribly wrong, and I can go into a lecture about what's going on there, but nonetheless, if he comes on the stand and your questions are not correct, if foundation is not established, or if it calls for what would be a hearsay answer, and I do understand that the old saying is what questions can you ask and are not objected to. But if they're objected to, they'll be ruled on. Unless you hear overruled, that would be the end of it.

And hopefully that's explanatory enough to say you can have him here, but I don't know what you're going to get out of that. That'll be your own—we're not just going to keep calling people in here and send them right back out the door because questions are not correct. At some point, I will stop and again, we'll have to send the jury home or let them out and have further discussion on that. That is not meant to be threatening in any way. That's just to let you know how these cases work in Florida.

Again, this demonstrates that the trial court sought to ensure that the trial proceeded in an orderly fashion, and also that Marquardt understood that if the State objected, then some testimony he sought to present might not be admissible.

Thus, we conclude that the request of the trial court that Marquardt provide a list of his witnesses and explain their relevance was not an attempt by the trial court to interject itself into the proceedings. Despite concerns that Marquardt may not be able to elicit admissible testimony from the witnesses, the trial court did not prevent Marquardt from presenting any witnesses, and Marquardt was allowed to develop his defense in his own way. Additionally, this discussion took place outside the presence of the jury and, therefore, did not taint the jury's perception of Marquardt's defense. Thus, because the trial court did not depart from its neutral

- 33 -

role or impede Marquardt's right to self-representation, and the jury was not exposed to these discussions, there is no way they impacted the verdict. Accordingly, we hold that no fundamental error occurred.

Marquardt also asserts that a comment made by the trial court while Marquardt listed his witnesses created a threatening atmosphere. The trial court made the following statement:

> Well, my concern with these folks is it looks like, and I hate to do this, and I'm not trying—and I'll do it outside the presence of the jury, but each one of them will have to be informed of the penalties for perjury, that they fully understand, because there's too many people that I've dealt with in the court system that do not understand. And well, I'm going to ask them just because I believe it was before you came to Hernando County, Mr. Magrino [the prosecutor], that your office got so aggressive on perjury cases in the court, but at one point there was—witnesses were getting arrested right and left that were committing perjury, which is what I think should happen. I mean, if they lie in a court, they should be arrested. And in fact, I would have no problem, they could say maybe someone with a greater mind that mine on legal knowledge may say, that's not right to have them arrested right there when they lie, but I think it is. If they want to lie on this stand, they should be arrested on this stand.
>
> And I'm not doing that threatening, but we're naming a lot of people here that, at least they're risking it, and that's five years. And just for knowledge here in Sumter County, somebody lied twice in this court and they got ten years because that's two charges. So they're now serving a ten-year sentence. And it happened to be in a case where they probably hadn't lied, they wouldn't have gotten but about the same so it ended up working out, I guess.

Marquardt did not object to this statement, and therefore it is also reviewed for fundamental error. See F.B., 852 So. 2d at 229.

- 34 -

This statement was made outside the presence of the jury and any witnesses. There is no evidence that Marquardt communicated the statement to any of the witnesses, and the trial judge <u>did not</u> in fact warn any of the witnesses presented by Marquardt of the penalties for perjury. As a result, none of the witnesses presented by Marquardt could have been threatened by the statement. Additionally, the trial court did not prevent Marquardt from presenting any of his witnesses. Therefore, there is no evidence in the record that this statement had any effect on the trial or created a threatening atmosphere, let alone reached down into the validity of the trial. Accordingly, we hold that no fundamental error occurred.

### III. Statement by the Prosecutor

During direct examination of the medical examiner, the State offered several autopsy photos of Ruiz and Wells into evidence. Marquardt objected to the photos for being too explicit. The following exchange occurred:

PROSECUTOR: Judge, I'd offer R for identification into evidence.

COURT: That would be, I think at this point would be State's—

THE CLERK: Fifteen.

COURT: Any objection?

MARQUARDT: Yes, Your Honor. I don't like autopsy photos being admitted, they're too explicit or not.

PROSECUTOR: Judge, if he's got a legal objection, that's fine. <u>That's evidence involved in this case as a result of what he did</u>, and that's something that I have to prove to these members of the jury.

- 35 -

COURT:  As to the objection then, is overruled and that will be State's 15 in evidence.

(Emphasis supplied.)  Marquardt contends that the prosecutor improperly expressed his personal belief as to Marquardt's guilt.  While he admits that no objection was made to this comment, Marquardt asserts on appeal that this statement was nevertheless improper and constitutes fundamental error.

We hold that the statement by the prosecutor was not improper.  Notably, after the prosecutor stated that the autopsy photos were "a result of what [Marquardt] did," the prosecutor concluded with the statement "and that's something that I have to prove to these members of the jury."  Thus, the prosecutor actually maintained that he was required to prove that Marquardt was guilty based on the evidence and sought to do so through the introduction of autopsy photos.  Autopsy photos are relevant evidence that may be presented during a murder trial.  See Henderson v. State, 463 So. 2d 196, 200 (Fla. 1985).

Marquardt relies upon three cases as examples of improper prosecutorial statements.  However, the statements in these cases were evidently improper and not accompanied by an acknowledgement that the burden of establishing the guilt of the defendant is on the State.  See Martinez v. State, 761 So. 2d 1074, 1081 (Fla. 2000) (holding that the prosecutor improperly asked a detective his opinion on the defendant's guilt, and then commented on the detective's opinion during closing

argument); <u>Gore v. State</u>, 719 So. 2d 1197, 1201 (Fla. 1998) (holding that the prosecutor made numerous improper, accusatory, and sarcastic statements to the defendant during cross-examination); <u>State v. Ramos</u>, 579 So. 2d 360, 362 (Fla. 4th DCA 1991) (holding that the prosecutor intentionally created the impression that the defendant was a suspect in an ongoing narcotics investigation and a kingpin supplier of narcotics). In contrast, the statement by the prosecutor in this case affirmatively recognized that the State has the burden of proof of guilt and did not place in jeopardy Marquardt's right to be tried solely based on the evidence presented to the jury. Thus, we hold that no fundamental error occurred.

## IV. Sufficiency of the Evidence

This Court is required to independently review the sufficiency of the evidence in every case for which a sentence of death has been imposed. <u>See</u> <u>Blake v. State</u>, 972 So. 2d 839, 850 (Fla. 2007); <u>see also</u> Fla. R. App. P. 9.142(a)(5). To determine the sufficiency of the evidence, this Court reviews the evidence presented in the light most favorable to the State and determines whether a rational trier of fact could have found the existence of the elements of the crime beyond a reasonable doubt. <u>Bradley v. State</u>, 787 So. 2d 732, 738 (Fla. 2001) (citing <u>Banks v. State</u>, 732 So. 2d 1065, 1068 n.5 (Fla. 1999)).

Here, the killer began shooting from outside of the victims' house. He injured Ruiz, then entered the house when she fled in order to complete the killing.

Although the record contains no evidence with respect to motive, the record reflects that DNA from Marquardt was found inside the victims' house, mixed with the victims' blood. Additionally, the victims' blood was found on clothes, shoes, and a knife seized from Marquardt upon his arrest in Wisconsin, as well as in Marquardt's car. Further, the gun that killed the victims was found in Marquardt's cabin. Finally, the evidence suggested that Marquardt, who lived in Wisconsin at the time of the murders, was in Florida on the date the victims were killed.

Accordingly, we conclude that the record provides sufficient evidence from which a rational trier of fact could convict Marquardt of the first-degree murder of Ruiz and Wells, as well as burglary of a dwelling with a firearm. We therefore affirm his convictions.

## V. Aggravating Circumstances

Marquardt next challenges the trial court's finding of two aggravating circumstances during the penalty phase. We first set forth the applicable standard of review for this claim, then analyze each aggravator in turn.

## A. Standard of Review

This Court will uphold the finding of the trial court with respect to an aggravating circumstance if it is supported by competent, substantial evidence. Guardado v. State, 965 So. 2d 108, 115 (Fla. 2007). We do not reweigh the evidence to determine whether each aggravating circumstance was proven by the

State beyond a reasonable doubt.  Rather, we review the record and determine whether the correct law was applied for each aggravating circumstance and whether the finding of that aggravating circumstance is supported by competent, substantial evidence.  Aguirre-Jarquin v. State, 9 So. 3d 593, 608 (Fla. 2009) (citing Willacy v. State, 696 So. 2d 693, 695 (Fla. 1997)).

## B.  CCP

Marquardt's first penalty-phase challenge is to the trial court's finding of the CCP aggravating circumstance.  For a finding of CCP by the trial court to be considered legally sufficient, the evidence must satisfy a four-part test:

> (1) [T]he killing must have been the product of cool and calm reflection and not an act prompted by emotional frenzy, panic, or a fit of rage (cold); and (2) the defendant must have had a careful plan or prearranged design to commit murder before the fatal incident (calculated); and (3) the defendant must have exhibited heightened premeditation (premeditated); and (4) there must have been no pretense of moral or legal justification.

Lynch v. State, 841 So. 2d 362, 371 (Fla. 2003) (citing Evans v. State, 800 So. 2d 182, 192 (Fla. 2001)).  For CCP to apply, the defendant must have committed the murder in a deliberate, professional, and coldly calculating manner.  Williams v. State, 37 So. 3d 187, 197 (Fla. 2010) (citing Mahn v. State, 714 So. 2d 391, 398 (Fla. 1998)).  Facts such as advance procurement of a weapon, lack of resistance or provocation by the victim, and the appearance of a killing conducted as a matter of

- 39 -

course support the CCP aggravator.  Franklin v. State, 965 So. 2d 79, 98 (Fla. 2007).

The cold element of CCP is established where the murder is not committed in the heat of passion.  See Wright v. State, 19 So. 3d 277, 299 (Fla. 2009).  Here, the record is devoid of any evidence that Marquardt acted out of frenzy, panic, or rage.  Indeed, the record reflects that Marquardt began shooting Ruiz even before he entered the house and, thus, there was no opportunity for provocation.  We conclude that the cold element of CCP is supported by the record.

The calculated element of CCP is established where the killer arms himself in advance, kills execution-style, and has time to coldly and calmly decide to kill.  See Hertz v. State, 803 So. 2d 629, 650 (Fla. 2001); see also Knight v. State, 746 So. 2d 423, 436 (Fla. 1998).  This Court has stated that calculation means to plan beforehand, to think out, design, prepare, or adopt by forethought or careful plan.  Rogers v. State, 511 So. 2d 526, 533 (Fla. 1987).  The record reflects that Marquardt procured two weapons before he arrived at the victims' house.  He then travelled to the house and began to shoot into the house from outside.  This supports the conclusion that Marquardt approached the house with the prearranged design to shoot and kill any occupants.  Therefore, we conclude that competent, substantial evidence supports the calculated prong of CCP.

Finally, the heightened premeditation element of CCP requires premeditation over and above what is required to prove the crime of first-degree murder. Farina v. State, 801 So. 2d 44, 54 (Fla. 2001). Heightened premeditation requires that the murderer fully contemplate effecting the victim's death. See Smith v. State, 28 So. 3d 838, 867 (Fla. 2009) (citing Geralds v. State, 601 So. 2d 1157, 1163 (Fla. 1992)). In this case, the evidence demonstrates that Marquardt armed himself with both a firearm and a knife before he arrived at the victims' house. He then approached the house and shot Ruiz through the screen door. He pursued her through the house and ensured that she died by shooting her again and stabbing her multiple times. After doing so, he shot and stabbed Wells. There is no evidence that Marquardt intended to do anything other than murder the occupants of the house. We have previously held that such actions may support the heightened premeditation element of CCP. See Turner v. State, 37 So. 3d 212, 226 (Fla. 2010). Accordingly, we reject this claim.

### C. HAC

Marquardt next contends that the HAC aggravating circumstance is not supported by the evidence for the murders of either Ruiz or Wells. For the HAC aggravating circumstance to apply, the crime must have been conscienceless or pitiless and unnecessarily torturous to the victim. Francis v. State, 808 So. 2d 110, 134 (Fla. 2001). "[T]he HAC aggravator focuses on the means and manner in

which death is inflicted and the immediate circumstances surrounding the death."

Hernandez v. State, 4 So. 3d 642, 669 (Fla. 2009) (quoting Brown v. State, 721 So. 2d 274, 277 (Fla. 1998)). Although the HAC aggravating circumstance normally does not apply if the victim died instantaneously, events preceding the death that cause the victim fear, emotional strain, and terror may render an otherwise quick death especially heinous, atrocious, and cruel. James v. State, 695 So. 2d 1229, 1235 (Fla. 1997). We have consistently upheld the HAC aggravator where the victim was repeatedly stabbed. Francis, 808 So. 2d at 134.

Ruiz was shot twice in the chest while she was in the kitchen of her house. The shots punctured her lung and would have caused her to cough up blood within seconds. She would have had difficulty breathing. One of the gunshots fired in the kitchen first grazed her thumb before it punctured her chest, as though she had her hand raised in front of her chest to open the door. The medical examiner could not speculate on her mental capacity, but stated, "generally speaking, she's shot, she probably realized she was and ran, like anybody else would." After the first two shots, Ruiz ran through the dining room and living room before she was shot a third time in her back. This shot severed her spinal cord and caused her to collapse. After she had been shot three times, she was stabbed three times in the neck while still conscious. Therefore, the record supports the conclusion of the

trial court that Ruiz suffered extreme physical pain as well as severe emotional distress due to her wounds.

Moreover, Ruiz knew that her daughter, granddaughter, and grandson were all in the house at the time of the attack. Ruiz knew that she had been shot and stabbed, and was likely going to die, and undoubtedly experienced extreme fear for what would happen to her family. See Francis, 808 So. 2d at 135 ("[A]lthough the evidence did not establish which of the two victims was attacked first, the one who was first attacked undoubtedly experienced a tremendous amount of fear, not only for herself, but also for what would happen to her twin."). Thus, competent, substantial evidence exists to demonstrate that HAC was properly found with respect to Ruiz.

In contrast, Wells died quickly. The medical examiner testified as follows during the Spencer hearing:

> Well, the whole dying process for Ms. Ruiz is longer. She's got two wounds, she moves, she's dropped and then stabbed. I think Ms. Wells was probably quicker, at least as far as her brain is concerned, because it's just one gunshot wound, intermediate range, hits her left carotid artery, pretty much destroys the carotid artery. She's going to go down in five to eleven seconds. Once she's down, there may be a period of consciousness for a period of time, but not very long.
> As opposed to her mom probably would have lived a little bit longer. There is going to be a little better blood flow to her brain, so if the incidents occurred at the same time, within moments, I think that the older woman probably lived a little longer than the younger woman.
> You can almost see that from the blood that spilled. The blood spilled underneath the younger woman is a bigger pool, and that's

- 43 -

blood that should be going to her brain. While the older woman, Ms. Ruiz, does have internal bleeding, but, again, it's not a destroyed major artery to her brain. So as far as the brain is concerned probably consciousness left Ms. Wells before Ms. Ruiz, if that's your question.

The record does not contain any evidence with respect to whether Wells witnessed her mother being shot and stabbed, whether she was aware that her mother was pursued through the house by a shooter, or whether she was aware that she would be attacked after her mother. She was shot once at a close range and would have lost consciousness shortly thereafter. Although the medical examiner testified that Wells would have experienced a short period of consciousness, he did not testify as to how long she was conscious, or whether she was conscious while she was stabbed. Therefore, the record does not contain competent, substantial evidence that Wells's murder was unnecessarily tortuous, or that she experienced sufficient fear, emotional strain, and terror to justify the application of HAC. Accordingly, we conclude that the trial court erred when it found the HAC aggravating circumstance with respect to Wells.

Nonetheless, we conclude that this error is harmless beyond a reasonable doubt. See Hall v. State, 107 So. 3d 262, 278 (Fla. 2012) ("When an aggravating factor is stricken on appeal, the harmless error test is applied to determine whether there is no reasonable possibility that the error affected the sentence."). Despite striking HAC, three weighty aggravating circumstances remain with respect to the murder of Wells: CCP, murder committed during the course of a burglary, and a

- 44 -

prior violent felony conviction. Based on the aggravation and mitigation found and weighed by the trial court, we conclude that there is no reasonable possibility that the error in finding HAC as to Wells affected the jury's recommendation or the ultimate sentence imposed by the trial court for her murder.

## VI. Attorney-Client Privilege

Marquardt next challenges the appointment of his standby counsel, Charles Vaughn, along with the investigators retained by Marquardt during the guilt phase, to assist the trial court during the penalty phase. Vaughn was counsel for Marquardt from July 29, 2010, through September 30, 2010, and then became standby counsel after Marquardt elected to proceed pro se. He remained standby counsel for the duration of the trial.

When Marquardt chose not to present evidence in mitigation during the penalty phase, the trial court appointed Vaughn, as well as the investigators retained by Marquardt during the guilt phase, to assist the trial court during the penalty phase. Marquardt objected to their appointment, alleging that this posed a conflict of interest.

On appeal, Marquardt contends that his attorney-client privilege was violated when Vaughn was appointed over his objection to present evidence in mitigation to aid the trial court. Further, Marquardt asserts that because the attorney-client privilege extends to investigators who assist counsel, the privilege

was also violated by the appointment of Marquardt's investigators to assist the trial court.

We conclude that no reversible error occurred and that Marquardt is unable to demonstrate any prejudice from the presentation of mitigation evidence during his sentencing proceedings. Under this Court's decision in Muhammad v. State, 782 So. 2d 343, 363-65 (Fla. 2001), which authorized trial courts to use standby counsel for the "limited purpose" of informing the court of and presenting mitigation, the trial court followed the law when it appointed standby counsel and Marquardt's investigators to assist the court in its obligation to consider mitigation evidence, as the trial court is required to do even when the defendant refuses to present mitigation. See id. at 363.

As a remedy for the alleged violation of his attorney-client privilege, Marquardt seeks a new penalty phase before a new judge. However, he has no right to this type of relief. Marquardt waived the presentation of mitigation evidence and is unable to demonstrate how the death sentence that was imposed, based in part on the trial court's consideration of the mitigation evidence presented through standby counsel, was compromised by the procedure the trial court followed.

In fact, Marquardt does not explain why a new penalty phase would be warranted, where he could either reverse course and present mitigation that he

previously made a knowing and voluntary decision to waive, or have no mitigation evidence considered by the trial court in violation of the requirements this Court has articulated for death penalty cases. In other words, Marquardt is not entitled to a new penalty phase where he can present mitigation because he has already made a knowing and voluntary waiver of mitigation, and he is not entitled to a new penalty phase without the trial court's consideration of any mitigation because trial courts are required to consider mitigation evidence during the penalty phase of a capital trial, even when the defendant waives the presentation of mitigation.

Moreover, there is no evidence that any confidential attorney-client information or communications were divulged. As the State points out, standby counsel was "not required to disclose confidential information about his former client, use confidential information in a way that disadvantaged his former client, or act in a manner that was against his former client's objective best interest." Marquardt v. State, No. SC12-555, Answer Br. of Appellee at 78 (Fla. Aug. 12, 2013). Instead, the evidence presented to the trial court was evidence that the trial court was required to consider in order to fulfill its sentencing obligation under Muhammad.

Nevertheless, while no error occurred, we recognize the tension that may exist when standby counsel is appointed by the trial court, even as an "officer of the court" and not as counsel for the defendant, to assist the court in its

- 47 -

consideration of mitigation evidence. Muhammad, 782 So. 2d at 364 & n.15. In order to avoid any appearance or potential of a conflict of interest, and to foster uniformity in the procedures to be followed in all cases where the defendant waives mitigation, we take this opportunity to prospectively modify Muhammad in one important respect.

Rather than utilizing standby counsel to present mitigation, the trial court should appoint an independent, special counsel to represent the public interest in bringing forth all available mitigation for the benefit of the jury, the trial court, and this Court, in order to assist the judiciary in performing its statutory and constitutional obligations in death penalty cases. This procedure will ensure that all available mitigation evidence is placed in the record at the time of the original sentencing proceeding, but will not prevent the defendant himself or herself from arguing in favor of the death penalty. We therefore recede from Muhammad to the extent we stated that the trial court could utilize standby counsel to present mitigation. See Muhammad, 782 So. 2d at 364 ("[T]he trial court has the discretion . . . to utilize standby counsel for th[e] limited purpose [of presenting mitigation].").

In all other respects, we adhere to the procedures set forth in Muhammad, which have served this state well for over a decade in ensuring "reliability, fairness, and uniformity in the imposition of the death penalty in these rare cases

where the defendant waives mitigation." Id. at 363. Accordingly, trial courts must continue to require the preparation of a meaningful, comprehensive presentence investigation report (PSI) in every case where the defendant is not challenging the imposition of the death penalty and refuses to present mitigation evidence. The PSI "should include information such as previous mental health problems (including hospitalizations), school records, and relevant family background." Id. The trial court should also require the State "to place in the record all evidence in its possession of a mitigating nature such as school records, military records, and medical records." Id. at 363-64. If the PSI and the accompanying records alert the trial court to the probability of significant mitigation, the trial court has the discretion either to call its own witnesses or, in light of our modification today, to appoint an independent, special counsel, who can call witnesses to present mitigation evidence. This procedure will continue to help ensure that every death sentence in this state is reliable, proportionate, and imposed in accordance with all constitutional and statutory directives, while avoiding any tension that may exist if standby counsel is used for the limited purpose of presenting mitigation.

## VII. Proportionality of the Sentence

Finally, this Court is required to conduct a comprehensive review of each death sentence to determine whether the murder falls within the category of both the most aggravated and the least mitigated of murders. See Anderson v. State,

841 So. 2d 390, 407-08 (Fla. 2003). This review assures uniformity in the application of the death sentence. See id. We review the totality of the circumstances and compare the case to other capital cases. Williams, 37 So. 3d at 205 (citing Offord v. State, 959 So. 2d 187, 191 (Fla. 2007)). This analysis does not involve a quantitative comparison between the number of aggravating and mitigating factors, but rather requires a qualitative review of the underlying basis for each aggravating factor and mitigating factor. Id.

This case involves a double homicide, where Marquardt was convicted of the murders of Ruiz and Wells. The trial court found four statutory aggravating circumstances, which we have upheld, as to the murder of Ruiz: (1) HAC (great weight); (2) CCP (great weight); (3) the murders were committed while Marquardt was engaged in the commission of a burglary (great weight); and (4) Marquardt had previously been convicted of another felony involving the use or threat of violence (aggravated burglary) (some weight). See §§ 921.141(5)(b), (d), (h), (i), Fla. Stat. The trial court found the same four aggravating circumstances as to the murder of Wells, except that we have stricken HAC.

These aggravating circumstances were weighed against various mitigating circumstances. The trial court found two statutory mitigating circumstances: (1) the capacity of Marquardt to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired

(some weight); and (2) the existence of any factors in Marquardt's background that would mitigate against imposition of the death penalty based on Marquardt being a law abiding citizen who was close to his family before there were reported instances of criminal activity (minimal weight) and was never previously violent toward anyone (minimal weight). See §§ 921.141(6)(f), (h), Fla. Stat. The trial court additionally found two nonstatutory mitigating circumstances: (1) Marquardt's good behavior during the proceedings (minimal weight); and (2) Marquardt's good behavior while in jail (minimal weight).

The trial court's finding of the statutory mitigating circumstance that Marquardt's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired was based entirely on Marquardt's earlier commitment to a mental health facility by a court in Wisconsin. This was the only evidence offered with respect to Marquardt's mental health. In this regard, the trial court noted as follows:

> The Defendant was examined by a psychologist on two different occasions, in September, 2010, and July, 2011, in which he was found competent to proceed. . . . The record appears to support the finding that Defendant was committed to a mental health facility in the animal mistreatment case in lieu of being incarcerated. Neither the Defendant nor the State has proffered any additional evidence that the Defendant did not have the capacity to appreciate the criminality of his conduct or that his ability to conform his conduct to the requirements of the law was substantially impaired. Based upon the minimal evidence presented to this Court, this mitigator is given some weight.

In contrast, the evidence supports four aggravating circumstances with respect to the murder of Ruiz, and three aggravating circumstances with respect to the murder of Wells. HAC, CCP, and a prior violent felony conviction are among the weightiest aggravating circumstances. See Kocaker v. State, 119 So. 3d 1214, 1232 (Fla.), cert. denied, 133 S. Ct. 2743 (2013); see also Wright, 19 So. 3d at 304 ("[T]he CCP aggravator is one of the most serious aggravators provided by the statutory sentencing scheme.").

Prior precedent of this Court supports the death sentence as a proportionate punishment for both killings. This Court has previously found the death sentence proportionate in cases of double homicides. See Robards v. State, 112 So. 3d 1256, 1273 (Fla. 2013) (finding the death sentences proportionate in a double homicide where three aggravating circumstances—prior violent felony based on the contemporaneous murder of the second victim, pecuniary gain, and HAC—were weighed against ten nonstatutory mitigating circumstances, including mental health issues); see also Francis, 808 So. 2d at 141 (finding death sentences proportionate in a double homicide where four statutory aggravating circumstances—prior violent felony based on the contemporaneous murder of the second victim, murders committed during the commission of a robbery, HAC, and the victims were particularly vulnerable due to advanced age—were weighed against two statutory mitigating circumstances and three nonstatutory mitigating

circumstances, including that the defendant was mentally ill or emotionally disturbed, and his ability to conform his conduct to the requirements of the law may have been impaired).

Further, this Court has determined a death sentence to be proportionate even where the statutory mental health mitigators have been established. See Brant v. State, 21 So. 3d 1276, 1285, 1287 (Fla. 2009) (concluding that the defendant's "impairment due to abnormal brain functioning and drug use, while mitigating, is not so mitigating as to make his death sentence disproportionate," where two aggravating circumstances—HAC and the murder was committed during a sexual battery—were weighed against three statutory mitigating circumstances and ten nonstatutory mitigating circumstances); see also Diaz v. State, 860 So. 2d 960, 971 (Fla. 2003) (finding death sentence proportionate where two aggravating circumstances—CCP and prior violent felony—were weighed against five statutory mitigating circumstances, including extreme mental or emotional disturbance); Rogers v. State, 783 So. 2d 980, 987, 1002-03 (Fla. 2001) (holding death sentence proportionate where the trial court found pecuniary gain and HAC aggravating circumstances, six nonstatutory mitigating circumstances, and the statutory mitigating circumstance of impaired ability to appreciate criminality of conduct or conform conduct to the requirements of the law based on psychosis, brain damage, psychological disease, and alcohol abuse).

Thus, we conclude that the death sentence is proportionate in this case for both murders.

## CONCLUSION

Based on the foregoing, we affirm Marquardt's convictions and sentences.

It is so ordered.

LABARGA, C.J., and PARIENTE, LEWIS, QUINCE, and PERRY, JJ., concur.
CANADY and POLSTON, JJ., concur in result.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION, AND IF FILED, DETERMINED.

An Appeal from the Circuit Court in and for Sumter County,
    William Henry Hallman, III, Judge - Case No. 602006CF000768CFAXFX

James S. Purdy, Public Defender, and Michael S. Becker, Assistant Public Defender, Seventh Judicial Circuit, Daytona Beach, Florida,

    for Appellant

Pamela Jo Bondi, Attorney General, Tallahassee, Florida,

    for Appellee