# Supreme Court of Florida

---

No. SC2023-0539

---

**STEVEN J. LORENZO,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

June 19, 2025

PER CURIAM.

This case is before the Court on appeal from two judgments of conviction of first-degree murder and sentences of death. We have jurisdiction. *See* art. V, § 3(b)(1), Fla. Const. The appellant, Steven Lorenzo, pleaded guilty to the first-degree murders of J.G. and M.W. Following a non-jury penalty phase, Lorenzo was sentenced to death for both murders. As we explain below, we affirm Lorenzo's convictions and sentences.

**FACTS AND PROCEDURAL BACKGROUND**

Lorenzo killed J.G. and M.W. in separate incidents in December 2003, after he met them at a local club and lured them to his home where he drugged and attacked them. In December 2022, Lorenzo entered a plea to two counts of first-degree murder. The trial court's sentencing order explained the facts surrounding the murders:

> On Friday evening, December 19th, 2003, [J.G.] attended a Christmas party in Tampa. [J.G.] and his friends, including Justin Laughlin, Jeffery Loehr and Tony Bragg decided to continue the evening at a local club, Club 2606, located at 2606 North Armenia in Tampa, Hillsborough County, Florida. [J.G.] separated from his friends to socialize at Club 2606. As Club 2606 was closing for the night, now early Saturday morning, December 20th, 2003, [J.G.] informed his friends that he had met two men, and he planned to leave with them. [J.G.]'s family and friends have never seen or heard from [J.G.] after leaving 2606 with those two men early Saturday morning, December 20th, 2003. Tony Bragg has previously testified that [Defendant] was the person who had spoken with [J.G.] at Club 2606 that evening.
> [M.W.] lived in an apartment with a friend, Fredrick Van Den Abbeel. [M.W.] had agreed to dog sit Patches for his close friends and former roommates, the Hartfords. After [M.W.] finished work at Bahama Breeze Saturday evening, December 20th, 2003, he left Patches with Mr. Van Den Abbeel . . . for the evening, but [M.W.] didn't come back that evening. The last relative or friend to hear from [M.W.] was a cell phone text from a friend Pete Karahalios[.] [I]t was common for [M.W.] and his friend to text each other, particularly when they were alone out

- 2 -

late at night. The text sent at about 1:30 a.m., Sunday, December 21st, stated merely . . . "On my way home . . . [.]" When [M.W.] did not return home, friends and relatives networked and distributed flyers in the area over the holidays asking for help in locating [M.W.]. [M.W.]'s body was finally found 17 days later in a parking lot of an apartment complex off West Hillsborough Avenue in unincorporated Hillsborough County.

[M.W.]'s badly decomposed body was wrapped in a printed fitted bed sheet and stuffed in the cargo compartment of [his] own . . . Jeep. Joint investigations were initiated into the disappearance of [J.G.] and . . . the discovery of the body of [M.W.] by the Tampa Police Department, the Hillsborough County Sheriff's Office and the Tampa Field Office of the Drug Enforcement Administration.

After speaking with numerous witnesses, the investigation began to focus on [Defendant] who lived at 213 West Powhatan, only a 10-minute drive away from Club 2606. That investigation led to the execution of several search warrants at 213 West Powhatan in the years 2004 and 2005. Among the items taken into evidence were stacks of hard copies of ["AIM"] chats between [Defendant] and persons with different screen names. One of those screen names was "MstrScott" . . . who would later be identified as Scott Schweickert. The instant messaging chats indicated that Schweickert and [Defendant] had met online in October 2003, and had also met face to face on several occasions, including planning to meet at 213 West Powhatan December 19th, 2003, just hours before the disappearance of [J.G.]. The instant messaging chats also indicated their mutual desire to drug and forcibly engage in dominant sex of unsuspecting young men. Schweickert was interviewed by investigators on several separate occasions.

Schweickert acknowledged his acquaintance with [Defendant]. He admitted that he, Schweickert, was with [Defendant] on December 19th, 2003. Schweickert acknowledged that he and [Defendant] met someone at

Club 2606, who accompanied Schweickert and [Defendant] back to 213 West Powhatan when Club 2606 closed in the early morning of December 20th, 2003. Schweickert initially denied participating in any forced physical contact with [J.G.] and denied any knowledge of the circumstances surrounding the disappearance of [J.G.]. Schweickert also initially denied being with [Defendant] the following night, the night that [M.W.] went missing [and] . . . denied knowing anything about the death of [M.W.]. In subsequent statements, Schweickert admitted [to] participating in the killing of [J.G.] and [M.W.] and the disposal of the bodies of [J.G.] and [M.W.].

Now, relating to the killing of [J.G.], Schweickert eventually admitted to participating with [Defendant] in the killing of [J.G.]. Schweickert admitted that after killing [J.G.] at 213 West Powhatan, he and [Defendant] used a reciprocating saw to dismember [J.G.] in the garage of 213 West Powhatan, placing each of the dismembered legs, arms, head and torso into garbage bags and then randomly distributing those separate bags in separate dumpsters in nearby neighborhoods.

Upon that information being supplied by Schweickert, a search warrant for the garage at 213 West Powhatan was approved. Investigators used preliminary serology testing and found indications of blood on the garage flooring. . . . The serology testing found indications of blood on the garage floor, the flooring, which was comprised of cobblestone bricks recessed in the dirt below. The bricks were sent to the Florida Department of Law Enforcement for DNA testing for comparison with the known DNA profile of [J.G.]. Suzanna Ryan, known as Suzanna Uhlery at that time, was a DNA expert at the FDLE. Ms. Ryan has testified that the DNA profile of the suspected blood from the cobblestone flooring of [Defendant's] garage at 213 West Powhatan matches the DNA profile of [J.G.], and the chances of this DNA sample being of someone else is one in the trillions. A gas mask, often used in sexual

domination, was also found at [Defendant's] residence, 213 West Powhatan, during one of the court-authorized searches. Ms. Ryan conducted DNA testing on the gas mask found in a black bag in [Defendant's] bedroom at 213 West Powhatan. Ms. Ryan has also testified that the DNA profile of the gas mask matched the DNA profile of the known DNA profile of [J.G.], and the chances of that DNA profile is of some person other than [J.G.] is one in trillions. No parts of the body of [J.G.] have ever been found.

. . .

Now, moving onto the killing of [M.W.]. In later statements, Schweickert admitted to remaining at 213 West Powhatan all day Saturday, December 20th, 2003. Schweickert and [Defendant] then returned to Club 2606 late Saturday night, early Sunday morning December 21, 2003. There, they met [M.W.], who was alone at Club 2606. They invited [M.W.] to return with them to 213 West Powhatan. Schweickert can identify the person depicted in photographs as the person who was killed by [himself] and [Defendant].

[M.W.] drove his Jeep and followed along with Schweickert and [Defendant] to 213 West Powhatan. [Defendant] provided a drink to [M.W.], who soon became essentially helpless in defending [himself against] the torture and sexual assault and the killing at the hands of [Defendant] and Schweickert. After killing [M.W.], Schweickert and [Defendant] went about the task of cleaning the body of [M.W.] in other areas of the West Powhatan residence which may leave clues to the murder. [Defendant] also took pictures of the lifeless [M.W.] at 213 West Powhatan.

After the photographs were taken, [Defendant] and Schweickert wrapped the body of [M.W.] in a bed sheet and placed the body in the cargo area of [M.W.]'s Jeep Cherokee. Schweickert drove [M.W.]'s Jeep and followed [Defendant], who was driving [Defendant's] own Jeep. [M.W.] and his Jeep were left in the same parking lot

- 5 -

where it was found along with [the body of] [M.W.] 17 days later, January 6th, 2004. The color and print of the fitted sheet wrapping [M.W.] matches the color and print of a bed top sheet found at 213 West Powhatan.

Investigators were also able to download photographs stored in [Defendant's] computer and camera, which were seized in one of the search warrants. The photographs included 20 photographs timestamped all within a few minutes of 5:00 a.m., Sunday, December 21st, 2003. The photos showed the apparent lifeless, sometimes contorted body of [M.W.], including evidence of a sexual battery in various positions inside [Defendant's] house at 213 West Powhatan. [M.W.]'s roommates and friends have identified [M.W.] as the person depicted in those photographs. [Defendant] and his federal attorney were shown those photographs. [Defendant] agreed that those photographs appeared to have been taken at 213 West Powhatan, and that one of the photos appears to include [Defendant's] hand posing the lifeless body of [M.W.]; [Defendant], however, denied recalling [M.W.] or anything occurring at his residence in the early morning hours of Sunday, December 21, 2003.

Although Schweickert initially denied knowing about the killing of [M.W.], in later statements, Schweickert admitted participating with [Defendant] in killing [M.W.]. The autopsy confirmed the identity of [M.W.] as the person found in the Jeep on January 6th, 2004; however, the decomposed condition of his body limited more details regarding the cause of death.

(Some omissions and some alterations in original.)

### Pretrial Proceedings

Lorenzo was indicted for the murders in 2016. At that time, he was serving a series of lengthy federal prison sentences for multiple counts of distribution of gamma-hydroxybutyric acid

(GHB) with the intent to commit a crime of violence, and one count of conspiracy to possess with intent to distribute GHB with the intent to commit crimes of violence. J.G. and M.W. were among the several victims of those crimes.

During his September 2017 arraignment, Lorenzo indicated that he wished to represent himself. The trial court conducted a lengthy *Faretta*[1] inquiry, after which the court found that Lorenzo was competent to waive counsel. The trial court also appointed standby counsel.

In response to certain statements made by Lorenzo in which he contested the trial court's jurisdiction over his criminal case and invoked sovereign citizen terminology, the trial court ordered a competency evaluation. However, Lorenzo refused to participate in the evaluation. Upon reviewing background information, observing Lorenzo, and interviewing detention deputies, Dr. Michael Gamache concluded, "This examiner's brief observations, in conjunction with my interview of detention staff, suggest no basis to suspect that the defendant suffers from any gross mental illness that interferes with

---

1. *Faretta v. California*, 422 U.S. 806 (1975).

his capacity for a rational and factual understanding of the legal proceedings against him." Moreover, Dr. Gamache concluded that Lorenzo's sovereign citizen assertions were not likely caused by mental illness but instead intended to delay the legal proceedings.

**Guilty Plea and Penalty Phase**

In December 2022, Lorenzo pled guilty to both counts of first-degree murder, and the trial court ordered a presentence investigation report (PSI). In February 2023, the trial court conducted a non-jury penalty phase, during which the State sought to prove four aggravating factors: (1) Lorenzo was previously convicted of another capital felony or of a felony involving the use or threat of violence to the person (prior violent felony); (2) the capital felony was especially heinous, atrocious, or cruel (HAC); (3) the capital felony was homicide and committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification (CCP); and (4) the capital felony was committed while the defendant was engaged in the commission of, or the attempt to commit, sexual battery or kidnapping.

Evidence of aggravation included Lorenzo's federal drug convictions, and testimony from seven of the victims in those

crimes detailing how Lorenzo drugged and assaulted them as they slipped in and out of consciousness.  Each of the victims was drugged at Lorenzo's home or in another location such as a hotel or a bar.  The victims were tied up, and duct tape was placed over their eyes and mouths.  During the commission of these crimes, Lorenzo also committed additional acts of violence that included inflicting burn marks, beating up the victims, and causing injuries that resulted in bleeding.

More than 800 instant message chat printouts revealed discussions between Lorenzo, Schweickert, and others about drug use, violent bondage activity, the use of drugs to incapacitate individuals, kidnapping, and making individuals disappear.  Chats between Lorenzo and Schweickert discussed going to meet young men at a bar and included a plan about a week before the murders to obtain and murder a victim.  Schweickert also testified in detail about the events surrounding the murders, including the plan to lure victims away from the bar, drug them, and kill them.

The search of Lorenzo's home led to the seizure of a bottle used to administer GHB, gas masks, serial killer books, and folders marked "missing guy articles."  Additionally, digital evidence

contained on two computer hard drives seized from Lorenzo's house revealed photographs of the deceased M.W. Multiple photographs of M.W.'s body were taken in different locations at the house around 5 a.m. on December 21, before Lorenzo and Schweickert transported and then abandoned M.W.'s body and vehicle in a parking lot.

The State also presented victim impact testimony from the families of J.G. and M.W.

Lorenzo did not present any defense witnesses, although the State briefly cross-examined him regarding mitigating circumstances that he raised in a written pro se notice. Lorenzo declined to answer the State's questions.

## Sentencing

Following the penalty phase, the trial court conducted a *Spencer*[2] hearing at which Lorenzo made brief comments but declined to offer evidence or argument. In February 2023, the trial court sentenced Lorenzo to death for each murder.

---

2. *Spencer v. State*, 615 So. 2d 688 (Fla. 1993).

The trial court found as to both murders the existence of each of the aggravating factors advanced by the State, and the court assigned each factor great weight.

The trial court also examined the entire record to determine if any mitigating circumstances existed.[3] The court considered five statutory mitigating circumstances—each of which was found to be not proven.[4] The court also considered nine nonstatutory

---

3. The court identified mitigating evidence in multiple sources: (1) the PSI prepared by the Florida Department of Corrections, (2) the mitigation report filed by standby counsel on March 23, 2020, (3) Lorenzo's pro se "Mitigation Notice" filed on December 14, 2021 (2021 mitigation notice), and (4) Lorenzo's pro se "Defense's Notice of Mitigation and Objection for Court Considerations at Sentencing Hearing" filed on January 18, 2023 (2023 mitigation notice).

4. Statutory mitigating circumstances found to be not proven were (1) Defendant has no significant history of prior criminal activity; (2) the victim was a participant in the defendant's conduct or consented to the act; (3) Defendant was an accomplice in the capital felony committed by another person and his participation was relatively minor; (4) Defendant acted under extreme duress or under the substantial domination of another person; and (5) the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired. All of these mitigating circumstances were argued by Lorenzo in his pro se 2023 mitigation notice, except for number five, which was set forth in the mitigation report prepared by standby counsel and provided to the State.

mitigating circumstances, three of which were found not proven, and six which were assigned weight ranging from slight weight to moderate weight: (1) Lorenzo had a traumatic childhood (not proven); (2) as a child, Lorenzo had a close relationship with his siblings and his mother (slight weight); (3) Lorenzo's mother was an alcoholic (slight weight); (4) Lorenzo was sexually abused as a child (not proven); (5) Lorenzo was the victim of domestic violence in two of his adult relationships (not proven); (6) Lorenzo was a habitual drug user (moderate weight); (7) Lorenzo received an electrical degree and maintained employment in that field (slight weight); (8) Lorenzo was part of a tight-knit neighborhood and was a good neighbor (slight weight); (9) Lorenzo has been a productive, model inmate while incarcerated (slight weight).

This direct appeal follows.

## ANALYSIS

Lorenzo appeals his convictions and sentences of death and raises two issues: (1) whether the trial court erred in permitting him to represent himself during the proceedings, and (2) whether the trial court erred in considering a mitigation report prepared and submitted by standby counsel in 2020. Additionally, consistent

with this Court's mandatory review in cases involving the direct appeal of a sentence of death, we review the record to ensure that Lorenzo's guilty plea was entered knowingly, intelligently, and voluntarily. As we explain, we affirm on all grounds.

### 1. Self-representation

Lorenzo, who was pro se throughout the proceedings, argues on appeal that he did not understand the nature of the proceedings against him and that the trial court failed to protect his right to a fair trial by permitting him to represent himself. Lorenzo's argument is without merit.

We review the trial court's ruling on Lorenzo's request for self-representation for an abuse of discretion. *See Knight v. State*, 211 So. 3d 1, 15 (Fla. 2016). Because this issue is unpreserved, Lorenzo is only entitled to reversal upon a finding of fundamental error. *See Hopkins v. State*, 632 So. 2d 1372, 1374-75 (Fla. 1994). However, there was no error, let alone fundamental error, in permitting Lorenzo to represent himself.

While a competent criminal defendant has a Sixth Amendment right to represent himself at trial, *see Tennis v. State*, 997 So. 2d 375, 377-78 (Fla. 2008), the trial court must find—as is the case

when determining a defendant's competency to stand trial—that the defendant has "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" and has "a rational as well as factual understanding of the proceedings against him," *see Godinez v. Moran*, 509 U.S. 389, 396 (1993) (quoting *Dusky v. United States*, 362 U.S. 402, 402 (1960)).

When a defendant unequivocally requests self-representation, the trial court must conduct a *Faretta* inquiry to determine whether the defendant knowingly, intelligently, and voluntarily waives the Sixth Amendment right to counsel. The purpose of the *Faretta* inquiry "is to determine whether the defendant actually *does* understand the significance and consequences of a particular decision and whether the decision is uncoerced." *Godinez*, 509 U.S. at 401 n.12 (citing *Faretta*, 422 U.S. at 835).

"[O]nce a court determines that a competent defendant of his or her own free will has 'knowingly and intelligently' waived the right to counsel, the dictates of *Faretta* are satisfied, the inquiry is over, and the defendant may proceed unrepresented." *Hooks v. State*, 286 So. 3d 163, 168 (Fla. 2019) (quoting *State v. Bowen*, 698 So. 2d 248, 251 (Fla. 1997)). "The accused must only 'be made

- 14 -

aware of the dangers and disadvantages of self-representation . . . .' " *Id.* at 167 (quoting *Faretta*, 422 U.S. at 835). This is "so that the record will establish that 'he knows what he is doing and his choice is made with eyes open.' " *Id.* (quoting *Adams v. United States ex rel. McCann*, 317 U.S. 269, 279 (1942)).

The trial court did not abuse its discretion in finding that Lorenzo was competent to represent himself. Indeed, the record indicates that Lorenzo understood the nature of the proceedings and that he was actively and intelligently involved throughout the proceedings.

At Lorenzo's arraignment in September 2017, the trial court granted his motion to proceed pro se and conducted an extensive *Faretta* inquiry. During subsequent court proceedings, the trial court conducted additional inquiries to ensure that Lorenzo wished to continue representing himself, that he did so freely, and that he was not under the influence of any substances. The trial court consistently renewed the offer of counsel, reminding Lorenzo that he had the benefit of having skilled standby counsel should he choose to utilize their services.

Before accepting Lorenzo's plea in December 2022, the trial court confirmed that Lorenzo wanted to continue representing himself, that he was not forced or threatened into doing so, and that he was not under the influence of drugs, alcohol, or prescription medication. At that time, the trial court also questioned standby counsel concerning Lorenzo's competency. Standby counsel for the guilt and penalty phases were present at the plea hearing and indicated as follows:

> **THE COURT:** All right. Let me just ask standby counsel, have you had any questions, either one of you, about Mr. Lorenzo's competency in this matter?
>
> **MR. GONZALEZ:** Your Honor, for the record, Brian Gonzalez, standby counsel in phase two. I have had zero concerns through my interaction with Mr. Lorenzo over multiple years, probably three, in excess of three years at any point in time that he was not competent to understand the charges against him, to manage his own defense and to accept and understand answers to questions that he posed of me.
>
> **THE COURT:** Mr. Sinardi. Agree?
>
> **MR. SINARDI:** Correct. Nick Sinardi, standby counsel, first phase. That is correct. I concur with Mr. Gonzalez. Mr. Lorenzo has always been very lucid, very intelligent, responded appropriately to all the questions that I posed, had a very clear understanding of the proceedings and had a rational basis as to why he wanted to enter the pleas actually. For the record, I had advised Mr. Lorenzo on more than one occasion and as late as last night not

to do this, and over my recommendations, since I'm not candidly his attorney, apparently, he is going to go forward with it.

**THE COURT:** All right. I appreciate that. And I couldn't agree more.

The trial court conducted further inquiries at the beginning of the penalty phase, after the State presented its penalty phase case, at the *Spencer* hearing, and at sentencing.

Lorenzo also points to his sovereign citizen assertions as proof that he lacked an understanding of the proceedings. However, Dr. Gamache concluded that Lorenzo's sovereign citizen arguments were likely intended as a delay tactic.

Moreover, the record is replete with evidence that Lorenzo was adept at representing himself and that he fully understood the nature of the proceedings against him. Lorenzo consistently made legal arguments that reflected his understanding of the proceedings, and he filed numerous pro se pleadings, such as his handwritten 2023 mitigation notice that well exceeded 100 pages. Lorenzo also ably conducted himself as a pro se advocate in court, lodging coherent objections and cross-examining witnesses. The

trial court did not abuse its discretion in ruling that Lorenzo was competent to represent himself.

## 2. Mitigation

Lorenzo also argues that the trial court erred in considering a mitigation report developed by standby counsel and submitted on Lorenzo's behalf in 2020 and that, by doing so, the court deprived him of the opportunity to control the presentation of mitigating evidence in his case. Lorenzo contends: "Appellant did not object to all evidence of mitigation; he objected to the consideration of standby counsel's packet of mitigating evidence because he wanted to enter his own motion of mitigating evidence. Appellant had the right to limit the scope of mitigation evidence considered by the trial court." The trial court did not err, and, if it had, any error would have been harmless.

The mitigation report at issue was provided to the State Attorney's Office in March 2020 during the course of plea negotiations and submitted to the trial court. Although the report was drafted by standby counsel, Lorenzo actively participated in its development. Standby counsel wrote:

Please accept this Memorandum as Mr. Lorenzo's initial written mitigation presentation. After spending a significant amount of time with Mr. Lorenzo as his Court Appointed Stand By Counsel, *this memorandum is submitted on his behalf and at his request.* It offers significant information as to why the State of Florida should not seek the death penalty for the murders of [J.G.] and [M.W.] and should instead consider and approve a plea in exchange for a life sentence in prison.

(Emphasis added.) The report reiterates in conclusion, "In that light, Steven Lorenzo would ask that the State consider waiving its intention to seek the death penalty and allow him to enter a plea in exchange for life in prison without the possibility of release."

At the December 2022 plea hearing, Lorenzo stated that he did not want the trial court to consider the mitigation report prepared by standby counsel, and the court stated that it was going to do so despite Lorenzo's objection. At the February 2023 *Spencer* hearing, Lorenzo acknowledged that the trial court would consider the report consistent with its obligation to consider mitigation in the record.

Even if we consider this issue sufficiently preserved, the trial court did not abuse its discretion in considering the report.

When a capital defendant waives the right to present evidence in mitigation, the court still retains its "responsibility to consider mitigating evidence in the record." *Bell v. State*, 336 So. 3d 211,

- 19 -

217 (Fla. 2022) (citing *Sparre v. State*, 164 So. 3d 1183, 1196 (Fla. 2015)). "[T]rial courts must continue to require the preparation of a meaningful, comprehensive presentence investigation report (PSI) in every case where the defendant is not challenging the imposition of the death penalty and refuses to present mitigation evidence." *Marquardt v. State*, 156 So. 3d 464, 491 (Fla. 2015). "The trial court should also require the State 'to place in the record all evidence in its possession of a mitigating nature such as school records, military records, and medical records.' " *Id.* at 491 (quoting *Muhammad v. State*, 782 So. 2d 343, 363-64 (Fla. 2001)).

While it is true that Lorenzo did not present witnesses during the penalty phase, this is not a case involving a waiver of mitigation. Not only did Lorenzo retain his right to have the trial court consider evidence in mitigation, he was also actively involved in its development—including the submission of his own written defense exhibits consisting of detailed mitigation arguments.

Thus, in addition to the transcript of Lorenzo's federal sentencing hearing, Lorenzo's 2021 mitigation notice, the PSI, and Lorenzo's 2023 mitigation notice, the trial court properly considered standby counsel's report, which was "submitted on [Lorenzo's]

behalf and at his request" and "[a]fter [standby counsel] spen[t] a significant amount of time with" Lorenzo.

While we conclude that the trial court did not abuse its discretion in considering the report developed by standby counsel with Lorenzo's input, had there been any error, it was harmless beyond a reasonable doubt. Of the five statutory mitigating circumstances that the trial court considered, four were raised by Lorenzo in his detailed 2023 mitigation notice. Only one— substantial impairment of the defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law—was raised solely in standby counsel's mitigation report, and the trial court found this mitigating circumstance not proven.

The trial court found that six of the nine nonstatutory mitigating circumstances that it considered were established. For all of the nonstatutory mitigating circumstances, the trial court indicated that it relied on both the mitigation report prepared by standby counsel *and* the PSI. Moreover, with respect to the finding that Lorenzo was a habitual drug user, the trial court also relied on

Lorenzo's 2023 mitigation notice. In no instance did the trial court rely solely on standby counsel's mitigation report.

### 3. Lorenzo's Guilty Plea

This Court has a mandatory obligation to independently review the sufficiency of the evidence underlying Lorenzo's convictions, and the "customary review" evaluates whether the convictions are supported by competent, substantial evidence. *Ocha v. State,* 826 So. 2d 956, 965 (Fla. 2002). However, where a defendant pleads guilty and waives a jury trial, the relevant inquiry is not whether there was competent, substantial evidence, but whether the defendant knowingly, intelligently, and voluntarily entered the plea. *See Tanzi v. State*, 964 So. 2d 106, 121 (Fla. 2007).

Although Lorenzo did not raise this issue in this appeal, "[p]roper review requires this Court to scrutinize the plea to ensure that the defendant was made aware of the consequences of his plea, was apprised of the constitutional rights he was waiving, and pled guilty voluntarily." *Ocha*, 826 So. 2d at 965 (citing *LeDuc v. State*, 365 So. 2d 149, 150 (Fla. 1978)).

In this case, the lengthy plea colloquy demonstrated Lorenzo's understanding of the "consequences of his plea" and "the

constitutional rights he was waiving as a result." *Russ v. State*, 73

So. 3d 178, 200 (Fla. 2011). Lorenzo read, initialed, and signed a

plea form that explained the charges against him and the possible

sentences that included the death penalty. Moreover, the trial court

revisited the matter of Lorenzo's competency for the purpose of

placing on the record that neither the court nor either of Lorenzo's

standby counsel had any concerns about Lorenzo's competency.

Lorenzo's plea was knowingly, intelligently, and voluntarily entered.

## CONCLUSION

For these reasons, we affirm Lorenzo's convictions and

sentences.

It is so ordered.

MUÑIZ, C.J., and CANADY, COURIEL, GROSSHANS, FRANCIS, and
SASSO, JJ., concur.
LABARGA, J., concurs in result with an opinion.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION
AND, IF FILED, DETERMINED.

LABARGA, J., concurring in result.

While I recognize that the majority has firmly rejected this

Court's decades-long practice of conducting comparative

proportionality review in cases involving the direct appeal of a

- 23 -

sentence of death, I concur in result because I continue to adhere to the views expressed in my dissenting opinion in *Lawrence v. State*, 308 So. 3d 544 (Fla. 2020).

An Appeal from the Circuit Court in and for Hillsborough County,
    Christopher C. Sabella, Judge
    Case No. 292016CF008779000AHC

Howard L. "Rex" Dimmig, II, Public Defender, and A. Victoria Wiggins, Assistant Public Defender, Tenth Judicial Circuit, Bartow, Florida,

    for Appellant

James Uthmeier, Attorney General, Tallahassee, Florida, and Stephen D. Ake, Senior Assistant Attorney General, Tampa, Florida,

    for Appellee